Filed 7/22/22 P. v. Gomez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>RUBEN GOMEZ,<br><br>      Defendant and Appellant. | D079134<br><br><br><br>(Super. Ct. No. SCE243463) |

APPEAL from an order of the Superior Court of San Diego County, John M. Thompson, Judge. Affirmed.

George L. Schraer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Steve Oetting, Alan L. Amann, and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

Ruben Gomez, who is serving a prison sentence for second degree murder, appeals from the denial of his petition for resentencing pursuant to

Penal Code former section 1170.95 (now renumbered as § 1172.6).[1] After issuing an order to show cause, the trial court found that Gomez was not entitled to resentencing because the People proved beyond a reasonable doubt that Gomez is guilty of murder under a theory that remains valid following the Legislature's change to the substantive law of murder in Senate Bill No. 1437 (Stats. 2018, ch. 1015) (Senate Bill 1437). Specifically, based on the transcripts and exhibits from Gomez's trial, and our appellate opinion in Gomez's appeal from his conviction (*People v. Gomez* (July 13, 2008, D049431) [nonpub. opn.]), the trial court found beyond a reasonable doubt that Gomez participated in a conspiracy to commit murder.

Gomez contends: (1) both the statutory language of section 1172.6 and the Sixth Amendment right to a jury trial should have prevented the trial court from making its own factual findings that Gomez is guilty of murder under a currently valid theory, rather than examining whether the jury made findings that would support guilt under a currently valid theory; (2) based on due process notice principles, a trial court deciding a petition for resentencing is not permitted to rely on a theory of murder that was not presented to the jury; (3) we should apply a de novo standard in reviewing the trial court's factual findings; and (4) insufficient evidence supports the trial court's finding that Gomez acted with the intent to kill needed for a conviction of conspiracy to commit murder.

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code. Effective June 30, 2022, section 1170.95 was renumbered as section 1172.6, with no change in text (Stats. 2022, ch. 58, § 10). In our discussion we will use the new statutory designation (i.e., § 1172.6) in referring, in general, to the statute previously designated as section 1170.95 and in referring to the specific statutory language of the *current* version of the statute. However, in referring to the specific statutory language in *prior* versions of the statute, we will refer to "former section 1170.95."

We conclude that Gomez's arguments lack merit, and we accordingly affirm the order denying Gomez's petition for resentencing.

I.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Murder of Daniel M.*

Around midnight on March 6, 2004, Daniel M. and his friend Yolanda C. were walking down Millar Street in El Cajon.  Daniel M. was a member of the Varrios Unidos criminal street gang, also referred to as V.U.

Immediately after Daniel M. and Yolanda C. walked past two trucks parked on the other side of the street, a man standing next to one of the trucks invoked the name of a rival gang, stating "This is Dukes.  This is Dukes['s] street."  Daniel M. replied, "That's cool."  Several other men then popped up from where they had been crouching near the trucks.  When Daniel M. started running away, a man emerged from behind one of the trucks, ran across the street, and started shooting at Daniel M.  Daniel M. fell to the ground, facedown.  The shooter ran up to Daniel M. and emptied his gun into Daniel M.'s back, killing him.  One of the men then said, "Come on.  Let's get out of here. . . .  We got to go."  The men drove away in the two trucks.

The police determined that Gomez, who was known to be a member of the Dukes criminal street gang, had a truck that matched Yolanda C.'s description of one of the trucks at the scene of the murder.  Police went to Gomez's house and searched Gomez's truck, in which they discovered a loaded firearm.

Gomez was directly tied to Daniel M.'s murder in September 2004 when Dukes gang member William Marquez agreed to cooperate with police by making secret recordings of conversations with fellow gang members.  In a

3

recorded conversation involving Gomez, Marco Moedano and Marquez, Moedano stated that he was the person who shot and killed Daniel M. Gomez spoke about the circumstances of the murder, explaining that he and the other Dukes members had been looking for rival gang members to "blast," but they had failed to locate any victims, when Daniel M., whom they had been looking for, unexpectedly walked past them.

> "[Gomez]: Nah, we were lookin' to blast some Locos and Orphans so we—It was me and Rascal and it was him [i.e., Moedano] and Boxer. And this fool says, 'man, let's call it a night and let's meet up in the street . . .' [LAUGHTER]

> "[Gomez]: . . . And we were looking for . . . we were looking for that fool from V.U. Like man, and we're like—and the next thing you know, hey, isn't that the fool from V.U.? An' he walking by us . . .

> "[Marquez]: He's walking with that bitch though, dog [i.e., Yolanda C.].

> "[Gomez]: She was there. She's the one that said it was Dukes and she described the truck. That's why they went to my pad.

> "[Moedano]: Yeah, it was fucked up, dog. But—but it was like unexpected, homey. Like . . .

> "[Gomez]: Yeah, we were not expecting that shit."

B.    *Gomez's Murder Conviction*

On February 22, 2005, the People filed a 25-count information against Gomez and three codefendants. Gomez was charged in the first two counts.

Count 1 charged Gomez, Moedano, and two other codefendants with murdering Daniel M. (§ 187, subd. (a).) As relevant here, with respect to Daniel M.'s murder, count 1 alleged that Moedano personally and intentionally discharged a firearm. As to Gomez specifically, count 1 alleged

4

that at least one of the principals personally used a firearm (§ 12022.53, subds. (d), (e)(1)), and that Gomez committed the murder for the benefit of a criminal street gang (§ 186.22, subd. (b)(5)). Count 2 charged Gomez, alone, with carrying a loaded firearm in a vehicle (§ 12031, subd. (a)(1)), and alleged that Gomez was an active participant in a criminal street gang (§ 12031, subd. (a)(2)(C)). Gomez and one of his codefendants (not Moedano) were tried in a joint trial, before separate juries.

At trial, during the prosecutor's closing argument, the prosecutor told the jury that "there's no controversy that the person who actually pulled the trigger was Marco Moedano," but the question was whether Gomez was vicariously liable for that murder. The prosecutor set forth two possible theories of vicarious liability for first degree murder, arguing that "the overwhelming evidence is that [Gomez] is in fact guilty as an aider and abettor and as a co-conspirator." Specifically, the jury instructions set forth the following theories of Gomez's vicarious liability for murder: (1) the murder was the natural and probable consequence of Moedano's commission of an aggravated assault, which Gomez aided and abetted; and (2) the murder was the natural and probable consequence of a conspiracy to commit an aggravated assault, in which Gomez participated.[2] The prosecutor

---

[2] With respect to the theory of murder based on aiding and abetting an assault under the natural and probable consequences doctrine, the jury was instructed:

> "Before you may decide whether the defendant is guilty of Murder, you must decide whether he is guilty of Assault with a deadly weapon or by means of force likely to produce great bodily injury.
> "To prove that the defendant is guilty of Murder, the People must prove that:
> "1.    The defendant aided and abetted the commission of an

5

specifically argued that the jury should rely on those theories to convict

Gomez of murder.[3]

---

Assault with a deadly weapon or by means of force likely to produce great bodily injury;
"2.    During the commission of Assault with a deadly weapon or by means of force likely to produce great bodily injury, the crime of Murder was committed;
"AND
"3.    Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of Murder was a natural and probable consequence of the commission of Assault with a deadly weapon or by means of force likely to produce great bodily injury."

With respect to the theory of murder based on a conspiracy to commit assault, the natural and probable consequence of which was murder, the jury was instructed:

"To prove that the defendant is guilty of the crime charged in Count One (Murder of Daniel [M.]), the People must prove that:
"1.    The defendant conspired to commit the crime of Assault with a deadly weapon or by means of force likely to produce great bodily injury;
"2.    A member of the conspiracy committed Murder to further the conspiracy;
"AND
"3.    Murder was a natural and probable consequence of the common plan or design of the crime that the defendant conspired to commit."

[3]    With respect to the theory of aiding and abetting, the prosecutor argued: "So, natural and probable consequences, [an] aider and abettor is not only liable for the crime he or she intended to help, but also any crime, any crime committed by the perpetrator that a reasonable person would have known is likely to happen. . . . Any time you have four criminal street gang members who go out specifically to violently assault rival gang members, a murder, a killing, a death naturally flows from a violent assault."  With respect to the theory of conspiracy, the prosecutor argued: "Just like aiders

On May 31, 2006, a jury convicted Gomez of first degree murder (§ 187, subd. (a)), and of carrying a loaded firearm in a vehicle (§ 12031, subd. (a)(1)). The jury found true the gang allegations as to both counts. The trial court imposed an indeterminate sentence of 25 years to life.

Gomez appealed from the judgment, and on July 13, 2008, we issued an opinion in which we concluded that the trial court had prejudicially erred in its response to a question from the jury about the circumstances under which Gomez could be convicted of first degree murder. (*People v. Gomez* (July 13, 2008, D049431) [nonpub. opn.].) We reversed Gomez's conviction for first degree murder and directed that if the People did not bring Gomez to retrial on the first degree murder count within the relevant time period, the trial court should proceed as if the remittitur constituted a modification of the judgment to reflect a conviction for second degree murder. (*Ibid*.)

The People decided that they would not retry Gomez. The conviction was therefore modified to second degree murder, and Gomez was resentenced to an indeterminate term of 15 years to life.

C.     *Proceedings on the Petition for Resentencing*

On January 30, 2019, Gomez filed a petition for resentencing pursuant to section 1172.6. The trial court appointed counsel for Gomez, and on October 21, 2020, it issued an order to show cause based on the conclusion that Gomez had made a prima facie case of eligibility for relief.

---

and abettors, we have natural and probable consequence liability for co-conspirators, too. It's not only for the intended crime of the conspiracy, it's also for any crime committed by any of the conspirators done in furtherance of the conspiracy that was naturally and probable to flow from the intended crime. Once again, would a reasonable person have foreseen that when four gang members get together to violently assault a rival that somebody might get killed, that the reasonable person could foresee that it would likely occur?"

In connection with the hearing to determine whether Gomez was entitled to relief on his petition for resentencing, the parties jointly submitted to the trial court an electronic copy of the reporter's transcripts from Gomez's trial.[4] Neither party sought to submit any evidence or testimony beyond what was already included in the record of conviction.

After hearing argument and considering the relevant portions of the trial record and our 2008 opinion, the trial court ruled that, although it was not the theory upon which the jury convicted Gomez, the evidence established beyond a reasonable doubt that Gomez was guilty of murder under a currently valid theory because he was a coconspirator to murder. "The conspiracy consisted of [Gomez] and three other members of his criminal street gang, the 'Dukes,' agreeing to kill members of rival street gangs the evening of the killing. The members of the conspiracy committed overt acts by driving around that evening looking for their victims and by one of the co-conspirators actually killing the victim who was in a rival gang. The overt acts occurred in San Diego County. Thus, the elements for a conspiracy are present in this case."

More specifically, the trial court found,

"[T]he evidence establishes the four gang members agreed at th[e] beginning of their evening to go around town looking for rival gang members to 'blast' or kill. Thus, the four made an agreement and thereby conspired to kill their gang rivals. They committed overt acts, as they tried to locate the other members of the gangs by driving around town. When they could not find Locos or Orphans, they decided to go to Millar Street to look for 'that fool from V.U.' The fool from V.U. turned out to be the

---

[4]     At Gomez's request, we have taken judicial notice of the appellate record in Gomez's appeal from the judgment of conviction. That record includes the trial transcripts that the parties submitted to the trial court in connection with the trial court's evaluation of Gomez's petition for resentencing.

victim, Daniel [M.] . . . As soon as the Dukes' members saw him come onto the street, they claimed their territory by calling out their gang name 'Dukes' and the victim was immediately shot and killed."

The trial court rejected Gomez's argument that it could consider only the theories of murder pursued at trial when deciding whether Gomez was guilty of murder under a currently valid theory. "[Gomez] contends that the conspiracy theory should be disallowed as a basis for the murder conviction at this proceeding, as the jury at his trial was not instructed on it. However, the fact the jury was not presented with the conspiracy theory is not a basis for disallowing it during this evidentiary hearing. At this hearing, the People have the ability to present evidence to establish [Gomez] is ineligible for resentencing. Penal Code section [1172.6] does not limit the People to the theories presented at the original trial."

Gomez appeals from the order denying his petition for resentencing.

## II.

## DISCUSSION

A.  *Legal Principles Applicable to Petitions for Resentencing Under Section 1172.6*

We begin our evaluation of Gomez's appeal with a review of the legal principles applicable to petitions for resentencing.

Effective January 1, 2019, Senate Bill 1437 substantially modified the law relating to murder, eliminating the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder (*People v. Gentile* (2020) 10 Cal.5th 830, 842-843 (*Gentile*)), and significantly narrowing the felony-murder exception to the malice requirement for murder (§§ 188, subd.

9

(a)(3), 189, subd. (e); see *People v. Lewis* (2021) 11 Cal.5th 952, 957).[5] As relevant here, pursuant to section 1172.6, an individual convicted of felony murder or murder based on the natural and probable consequences doctrine may bring a petition for resentencing if the person could not be convicted of murder after the changes to that crime enacted by Senate Bill 1437. (See *Lewis*, at p. 957; *Gentile*, at p. 843.)

When presented with a petition seeking relief under section 1172.6, the trial court must first determine whether the petitioner has made a prima facie case for relief. (§ 1172.6, subd. (c).) If the petitioner makes a prima facie case, the trial court must issue an order to show cause, followed by an evidentiary hearing to determine whether to recall the sentence and resentence the petitioner. (*Id.*, subds. (c), (d)(1).)

The People have the burden at the hearing held pursuant to section 1172.6, subdivision (d)(3) to establish that the petitioner is not entitled to resentencing by proving that the petitioner is guilty of murder under a currently valid theory. (§ 1172.6, subd. (d)(3).) The parties may present additional evidence, beyond the record of conviction, for the trial court to consider in making its ruling.[6]

---

[5] As amended by Senate Bill No. 775 (2021-2022 Reg. Sess.; Stats. 2021, ch. 551, § 2), effective January 1, 2022, the ameliorative provisions of Senate Bill 1437 now also apply to attempted murder and voluntary manslaughter.

[6] The version of the statute that existed when the trial court decided Gomez's petition stated that at the hearing held pursuant to former section 1170.95, subdivision (d)(3), "[t]he prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (Former § 1170.95, subd. (d)(3).) The statute now provides, "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously

After holding a hearing pursuant to section 1172.6, subdivision (d)(3), if the trial court concludes that the petitioner is entitled to relief, "[t]he petitioner's conviction shall be redesignated as the target offense or underlying felony for resentencing purposes if the petitioner is entitled to relief pursuant to this section, murder or attempted murder was charged generically, and the target offense was not charged." (§ 1172.6, subd. (e).)

As we have explained, Gomez was tried for murder under two theories of vicarious liability, both of which relied on the natural and probable consequences doctrine: (1) he entered into a conspiracy to commit an aggravated assault, the natural and probable consequence of which was murder; and (2) he aided and abetted an aggravated assault, the natural and probable consequence of which was murder. Under current law, Gomez could not have been convicted under either of these theories because they both relied upon the natural and probable consequences doctrine. Senate Bill 1437 eliminated the natural and probable consequences doctrine as a basis for murder by amending section 188, which now provides, "Except as stated in subdivision (e) of Section 189 [governing felony murder], in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3); see also *Gentile*, *supra*, 10

admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens." (§ 1172.6, subd. (d)(3).)

11

Cal.5th at p. 851 ["section 188[, subd.] (a)(3) bars conviction for second degree murder under a natural and probable consequences theory"].)[7] "[T]he natural and probable consequences doctrine authorizes precisely what Senate Bill 1437 forbids: it allows a factfinder to impute malice 'to a person based solely on his or her participation in a crime.' (§ 188[, subd.] (a)(3).)" (*Gentile*, at p. 847.)

Therefore, the question before the trial court on Gomez's petition for resentencing was whether Gomez was guilty of murder under a theory that was still valid after Senate Bill 1437 eliminated the natural and probable consequences doctrine as a basis for a murder conviction.

The trial court found, beyond a reasonable doubt, that Gomez was guilty of murder under the theory that he participated in a conspiracy to murder Daniel M. It is beyond dispute that Senate Bill 1437 did not eliminate conspiracy to commit murder as a valid theory of murder liability for someone who was not the actual killer. This is because "a conviction of conspiracy to commit murder requires a finding of intent to kill" (*People v. Swain* (1996) 12 Cal.4th 593, 607 (*Swain*)), satisfying the requirement of malice aforethought. (See *People v. Medrano* (2021) 68 Cal.App.5th 177, 186 [petitioner was ineligible as a matter of law for resentencing under section 1172.6 because he was convicted of conspiracy to commit murder].)

---

[7]    In 2014, our Supreme Court held that "a defendant cannot be convicted of *first degree* premeditated murder under the natural and probable consequences doctrine." (*People v. Chiu* (2014) 59 Cal.4th 155, 167, italics added.) Senate Bill 1437 effectively extended that prohibition to second degree murder as well.

B.    *Gomez's Contention That the Trial Court Is Not Authorized to Make Its Own Factual Finding of Guilt*

We first consider Gomez's contention that the trial court, in deciding a petition under section 1172.6, is not permitted to make its *own* factual finding of guilt, and is, instead, limited to determining whether the jury made findings that would support a murder conviction under a currently valid theory. According to Gomez, "for purposes of review of the merits of a petition under section [1172.6], the trial court should be seen as reviewing a judgment to determine if the jury made a factual finding necessary for conviction under the elements currently required for a murder conviction. The trial court is not acting as an independent trier of fact for purposes of determining itself whether the evidence at trial established the currently-required elements of murder beyond a reasonable doubt." Gomez contends that the proper inquiry for the trial court is whether "the record shows beyond a reasonable doubt that the jury at the original trial found the facts now required for a conviction for murder." Thus, according to Gomez, in his case "[w]hat the trial court should have done was determine whether, under the instructions given, the jury at [his] trial found that [he] acted with an intent to kill."

Gomez argues that the approach he advocates is required both by the statutory language and "a defendant's Sixth Amendment right to a jury trial." As we will explain, neither the statutory language nor the Sixth Amendment right to a jury trial supports Gomez's position.

Turning first to the statutory language, at the time of the trial court's decision on Gomez's petition, former section 1170.95, subdivision (d)(3) stated, "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (Former

13

§ 1170.95, subd. (d)(3).) Gomez specifically relies on the statement that the People must prove "that the petitioner is ineligible for resentencing." (*Ibid*.) He argues that this language reasonably could be read to mean that the People have to "show beyond a reasonable doubt that the use of the old law did not contribute to the verdict, or to show beyond a reasonable doubt that the jury decided the facts now required by [Senate Bill] 1437."

However, effective January 1, 2022, the Legislature passed Senate Bill No. 775, which added clarifying language to former section 1170.95. (Stats. 2021, ch. 551, § 2.) The statute now provides, "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution *to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder* under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019. . . . A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1172.6, subd. (d)(3), italics added.) The Legislature described this amendment as "[r]eaffirm[ing] that the proper burden of proof at a resentencing hearing under this section is proof beyond a reasonable doubt." (Stats. 2021, ch. 551, § 1, subd. (c).)

After the enactment of Senate Bill No. 775, case law recognizes that the trial court's role in a proceeding under section 1172.6 is to act as a finder of fact and to make a determination, in the first instance, whether the petitioner is guilty of murder under a currently valid theory. (*People v. Clements* (2022) 75 Cal.App.5th 276, 294, 297 (*Clements*) [describing Senate Bill No. 775 as having "confirmed" that the trial court makes findings beyond a reasonable doubt]; *People v. Garrison* (2021) 73 Cal.App.5th 735, 745

14

[describing Senate Bill No. 775 as "abrogating" a prior opinion on the trial court's role in deciding a petition for resentencing].) The trial court acts as "an independent factfinder, to determine beyond a reasonable doubt whether defendant is guilty of murder under a valid theory of murder." (*Garrison*, at p. 745.) "The question is whether the petitioner committed murder under a still-valid theory, and that is a factual question." (*Clements*, at p. 294.) We follow this case law and the current statutory language to reject Gomez's contention that the statutory language limits the trial court to a determination of whether the jury made findings that would support a murder verdict under current law.

Gomez also contends that regardless of the statutory language, the Sixth Amendment right to a jury trial supports his argument. The due process clause of the Fourteenth Amendment and the jury-trial guarantee of the Sixth Amendment, "[t]aken together, . . . indisputably entitle a criminal defendant to 'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.' " (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 477.) Gomez contends that this constitutional right to a jury trial prevents a trial court from making a factual finding of guilt in ruling on a petition under section 1172.6.

Numerous courts have considered and rejected the contention that a defendant has a Sixth Amendment right to a jury trial in a resentencing proceeding held under section 1172.6. (See *People v. Myles* (2021) 69 Cal.App.5th 688, 659, fn. 4; *People v. James* (2021) 63 Cal.App.5th 604, 607-611 (*James*); *People v. Howard* (2020) 50 Cal.App.5th 727, 740; *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1156-1157.) The basis for rejecting the application of the Sixth Amendment right to a jury trial in the context of a

15

petition for resentencing under section 1172.6 is persuasively discussed in *James*, at pages 607 through 611.

As *James* points out, in the similar context of the resentencing procedures created by Proposition 36 and Proposition 47, case law holds that the Sixth Amendment right to a jury trial is not triggered by those resentencing procedures, as they are acts of lenity by the electorate. (*James, supra*, 63 Cal.App.5th at pp. 608-609, citing *People v. Perez* (2018) 4 Cal.5th 1055, 1063-1064 (*Perez*) and *People v. Rivas-Colon* (2015) 241 Cal.App.4th 444, 451-452.) *James* relies on those holdings to conclude that the same result applies in a proceeding for resentencing under section 1172.6, because that proceeding is also based on an act of lenity. (*Ibid*.)

Gomez contends that the resentencing procedures created by Proposition 36 and Proposition 47 are not analogous to resentencing under section 1172.6 because the previous resentencing schemes did not require the trial court to make a finding of guilt under a newly defined offense. However, the appellant in *James* made the same argument, and *James* rejected it. (*James, supra*, 63 Cal.App.5th at p. 609.) *James* explained, "Section [1172.6] is 'an act of lenity' that requires, under specified circumstances, reduction of the offense for which he was properly convicted. The constitutional right to a jury trial does not require a jury determination of those circumstances. '[T]he retroactive relief . . . afforded by Senate Bill 1437 is not subject to Sixth Amendment analysis. Rather, the Legislature's changes constituted an act of lenity that does not implicate defendants' Sixth Amendment rights.' . . . No constitutional provision required the Legislature to authorize relief under the conditions specified in section [1172.6] and none compels it to make the conditions subject to jury determination." (*James*, at p. 609.) As *James* further explained, "the Legislature was not constitutionally required to make

16

the amended definition of murder created by Senate Bill No. 1437 retroactive as to convictions, like appellant's, that had become final. . . . [¶]  Because the authorization of retroactive relief in Senate Bill No. 1437 was an act of lenity, the Legislature was free to condition the availability of such relief on the convicted person prevailing at an evidentiary hearing conducted pursuant to the non-jury procedure set forth in section [1172.6]." (*James*, at pp. 610-611.) We adopt *James*'s reasoning to reject Gomez's contention that the Sixth Amendment right to a jury trial prohibits the trial court from making a finding of guilt in a proceeding held under section 1172.6.

In another attempt to establish that the trial court should not be permitted to make a finding of guilt in ruling on a petition for resentencing Gomez also argues that we should look to the inquiry that a trial court applies "when there is a change in the law that requires proof of an element based on a new factual showing that was not required at the time of trial, and that change in the law comes about *through a judicial decision*."  (Italics added.)  Gomez cites several habeas corpus opinions that arose in such a context. (See, e.g., *In re Lucero* (2011) 200 Cal.App.4th 38, 50; *In re Martinez* (2017) 3 Cal.5th 1216, 1225; *In re Rayford* (2020) 50 Cal.App.5th 754, 781.) He urges us to rely on that case law to hold that a trial court considering a petition under section 1172.6 should apply the same inquiry that a trial court uses in ruling on a petition for habeas corpus following a judicial decision that clarifies existing law.  In those cases, the trial court *does not* act as an independent finder of fact in deciding whether to grant relief. (*Lucero*, at p. 50; *Martinez*, at p. 1225; *Rayford*, at p. 781.)  We reject Gomez's argument because the case law he cites is inapposite.  Senate Bill 1437 enacted a change in the statutory provisions governing murder; it was not a clarification, through judicial decision, of the elements of a crime set forth in

17

an already-existing statute. A trial court ruling on a petition for resentencing brought under section 1172.6 is not analogous to a trial court ruling on a petition for habeas corpus.

C. *Gomez's Contention That Based on Due Process Notice Principles the Trial Court Improperly Relied on a Theory of Murder Not Presented at Trial*

Next, Gomez contends that due process notice principles preclude a trial court deciding a section 1172.6 petition from applying a theory of murder that was not presented to the jury. Specifically, Gomez contends that in his case, "because the People did not try the case on the theory of conspiracy to commit murder, [his] [Senate Bill] 1437 petition cannot be denied on this basis." Gomez argues he "had no notice that the prosecutor would proceed on a theory of conspiracy to commit murder, or that he would have to defend against that theory. At trial, he thus had no 'chance to be heard' on this issue." According to Gomez, "where the prosecution raises a new theory in a proceeding brought after the judgment became final, but is based on evidence introduced at trial, the failure to rely on the theory at trial should be viewed as violating due process principles of notice."

As an initial matter, we observe that case law, including from our Supreme Court, describes section 1172.6 as *permitting* a trial court to rely on a theory of murder that was not presented at the petitioner's trial. As our Supreme Court has stated, "We agree that the Legislature authorized the parties to offer new or additional evidence during the section [1172.6] process in order to allow the parties *to explore issues they did not explore under the prior state of the law*. The statute contemplates that such evidence may inform whether a conviction remains valid despite the ameliorative provisions of Senate Bill 1437." (*Gentile, supra*, 10 Cal.5th at p. 856, italics added.) As another court has observed, "By allowing new evidence and

18

providing for an evidentiary hearing, the Legislature plainly intended that the issues concerning whether the defendant was guilty *under theories of murder not previously or necessarily decided* would be resolved anew, through a factfinding process affording a degree of due process to the petitioner." (*People v. Duchine* (2021) 60 Cal.App.5th 798, 813, italics added.) Although these opinions do not expressly address the due process notice issue raised by Gomez, they are valuable in showing that it is generally understood that a trial court in a section 1172.6 proceeding may find a petitioner guilty of murder on a theory not presented at trial.

To support his contention that due process notice principles prevent the trial court in a section 1172.6 proceeding from relying on theories of murder not presented to the jury, Gomez relies exclusively on case law arising under the Sixth Amendment. (*Sheppard v. Rees* (9th Cir. 1989) 909 F.2d 1234, 1236 (*Sheppard*) ["The Sixth Amendment guarantees a criminal defendant a fundamental right to be clearly informed of the nature and cause of the charges in order to permit adequate preparation of a defense"]; *Gray v. Raines* (9th Cir. 1981) 662 F.2d 569, 571 ["The issue before this Court is whether Gray's conviction . . . violated the sixth amendment to the United States Constitution, which gives an accused the right 'to be informed of the nature and cause of the accusation.' "].) In relevant part, the Sixth Amendment states, "In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation." (U.S. Const., 6th Amend.)

Gomez's complaint is not that the charging documents in his murder prosecution failed to allege that he was guilty as a coconspirator to murder. Indeed, it is well-established that a defendant in a murder proceeding receives adequate due process notice when murder is pled simply, without

19

any specific degree or theory of murder, including that the defendant was a coconspirator to murder. (*People v. Gallego* (1990) 52 Cal.3d 115, 188; *People v. Lucas* (1997) 55 Cal.App.4th 721, 737.) Instead, Gomez relies on case law holding that a defendant's Sixth Amendment right to be informed of the nature and cause of the charges in a murder prosecution may *nevertheless* be violated when the prosecution affirmatively misleads the defendant about the theory of murder that it will argue to the jury. (*Sheppard, supra,* 909 F.2d at pp. 1235-1237 [Sixth Amendment violation when the prosecution did not reveal its intention to proceed under a felony-murder theory until after pretrial proceedings, opening statements, and the taking of testimony]; see also *Gallego*, at p. 189 [discussing *Sheppard*'s recognition of a Sixth Amendment violation based on "an 'ambush' by the prosecution"].) Gomez contends that he is in a similar position to the defendant in *Sheppard* because he was misled at trial into believing that conspiracy to commit murder was *not* a theory that he had to defend against, but he is now required to defend against that theory in the context of this section 1172.6 proceeding.

We reject Gomez's contention that the Sixth Amendment right to notice of "the nature and cause of the accusation" is applicable here for the same reason we have rejected his contention that the Sixth Amendment right to a jury trial applies: a resentencing proceeding under section 1172.6 is an act of lenity by the Legislature; it is not a criminal proceeding covered by the Sixth Amendment. "The Sixth Amendment applies '[i]n all criminal prosecutions.' (U.S. Const., 6th Amend.) A petition under section [1172.6] is not a criminal prosecution . . . ." (*People v. Silva* (2021) 72 Cal.App.5th 505, 520 (*Silva*).) Thus, "the Sixth Amendment has no application to a section [1172.6] resentencing proceeding." (*Ibid*.)

The court in *People v. Howard* (2020) 50 Cal.App.5th 727, 740 (*Howard*), specifically examined and rejected the argument that due process notice principles arising under the Sixth Amendment apply in a section 1172.6 proceeding.[8] *Howard* held, "The retroactive relief provided by section [1172.6] reflects an act of lenity by the Legislature 'that does not implicate defendants' Sixth Amendment rights.' . . . The redesignation does not increase Howard's sentence. We reject Howard's argument that the residential burglary designation violated his constitutional due process rights." (*Howard*, at p. 740.) Although *Howard* concerned a redesignation and resentencing procedure *after* a petitioner was determined to be entitled to relief under section 1172.6, we perceive no reason why *Howard*'s analysis should not apply here as well. Here, as in *Howard*, because a section 1172.6 proceeding is not a criminal prosecution that can increase the petitioner's sentence, but is rather an act of lenity by the Legislature, the Sixth Amendment does not apply.[9] The theories of guilt presented at trial

---

[8] In *Howard*, the parties agreed that the petitioner was entitled to be resentenced to a target offense or underlying felony pursuant to section 1172.6, subdivision (e). (*Howard*, *supra*, 50 Cal.App.5th at p. 736.) The issue was whether due process principles of notice arising under the Sixth Amendment limited the target offense or underlying felony that the trial court could select in redesignating the petitioner's conviction, or whether there was no limitation, in which case the trial court could redesignate the conviction as the uncharged crime of first degree residential burglary. (*Id.* at pp. 736, 740.)

[9] Of course, as one court has observed, "those who seek section [1172.6] relief do not sacrifice their rights to due process under the Fifth and Fourteenth Amendments. (U.S. Const., 5th & 14th Amends.; Cal. Const., art. I, §§ 7, 15.)" (*Silva*, *supra*, 72 Cal.App.5th at pp. 520-521.) However, as *Silva* explains, those rights entitle the petitioner to meaningful notice *within the context of the section 1172.6 proceeding* so that the petitioner may respond to

accordingly do not limit the theories of guilt that may be relied upon in a proceeding under section 1172.6.

Gomez also contends that the People should be judicially estopped from relying on a theory of murder that was not presented at trial. " ' " 'Judicial estoppel precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position.' " ' " (*People v. Castillo* (2010) 49 Cal.4th 145, 155.) "The doctrine applies when '(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake.' " (*Aguilar v. Lerner* (2004) 32 Cal.4th 974, 986-987 (*Aguilar*).)

Gomez's judicial estoppel argument lacks merit because at least one of the prerequisites for the application of the doctrine are not present. For a party to be judicially estopped, the two positions it has taken must be "totally inconsistent." (*Aguilar*, *supra*, 32 Cal.4th at p. 986.) Here, no total inconsistency exists between (1) the theory that Gomez is guilty of conspiracy to commit an aggravated assault, the natural and probable consequence of which is murder (as the People asserted at trial); and (2) the theory that Gomez is guilty of conspiracy to commit murder (as the People assert in this section 1172.6 proceeding). The positions are not totally inconsistent because a finding that a person entered into a conspiracy to assault a victim does not

---

the People's *current* theory of the petitioner's criminal liability. (*Id*. at pp. 521-523.) Here, there is no dispute that Gomez received ample notice of the People's theory that the trial court could find him guilty as a coconspirator to murder, as the People thoroughly briefed that theory in their return to the order to show cause.

foreclose a finding that the person *also* entered into a conspiracy to kill that same victim during the assault.

D. *Gomez's Challenge to the Standard of Review*

We next address Gomez's argument regarding the standard of review that we should apply to the trial court's finding that he is guilty of murder as a participant in a conspiracy to murder Daniel M.

Case law uniformly holds that in an appeal from an order after the trial court holds a hearing pursuant to section 1172.6, subdivision (d)(3), the appellate court reviews the trial court's findings to determine whether they are supported by substantial evidence. (See, e.g., *People v. Cooper* (2022) 77 Cal.App.5th 393, 412; *Clements*, *supra*, 75 Cal.App.5th at p. 298; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 985; *People v. Williams* (2020) 57 Cal.App.5th 652, 663; *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1087.)

Gomez does not dispute that substantial evidence review is proper for *some* trial court orders following a hearing held pursuant to section 1172.6. However, Gomez argues that a de novo standard of review should apply in a case, such as his, in which the trial court did not hear any live testimony and relied solely on written documents, including reporter's transcripts from prior proceedings, over which it did not preside. According to Gomez, "where, as here, no one testifies, and the verdict is based entirely on documentary evidence, the appellate court is in the same position as the trial court to evaluate the strength of the evidence. The rationale for deferential review is not present and de novo review is appropriate." He contends that "[t]here is no sound reason why this Court should defer to the decision of the trial court . . . when it comes to evaluating the relevant facts."

Our colleagues in Division Two recently considered and rejected an identical argument by relying on our Supreme Court's opinion in *Perez*,

*supra*, 4 Cal.5th 1055. (*Clements*, *supra*, 75 Cal.App.5th at p. 301.) *Perez* concerned the analogous context of a petition for recall of sentence under Proposition 36. In such a proceeding, certain persons sentenced under the Three Strikes law are eligible to petition the trial court for resentencing. (§ 1170.126, subds. (a), (b).) The factual question before the trial court in *Perez* was whether the defendant was ineligible for resentencing because he was armed with a deadly weapon during the commission of the relevant offense. (*Perez*, at p. 1062.) The People argued that, on appeal, de novo review of the trial court's finding on that issue was "more appropriate because trial courts do not have an advantage over appellate courts in determining eligibility based on the record of conviction." (*Id*. at p. 1066.) Our Supreme Court disagreed, concluding that "even if the trial court is bound by and relies solely on the record of conviction to determine eligibility, [where] the question . . . remains a question of fact . . . we see no reason to withhold the deference generally afforded to such factual findings." (*Ibid*.)[10] Here, similar to *Perez*, the trial court made a finding regarding Gomez's eligibility for resentencing, which was a question of fact. As in *Perez*, there is "no reason to withhold the deference generally afforded to such factual findings" (*ibid*.), even when the trial court based its findings on a cold record.

Gomez makes no attempt to grapple with *Perez* or explain why it should not control here. Instead, he cites a series of cases, all of which we find to be inapposite.

---

[10] The generally applicable rule is that "an appellate court should defer to the factual determinations made by the trial court when the evidence is in conflict," regardless of whether "the trial court's ruling is based on oral testimony or declarations." (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 479 (*Shamblin*).) "[T]hat the trial court's findings were based on declarations and other written evidence does not lessen the deference due those findings." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711, fn. 3 (*Haraguchi*).)

First, Gomez relies on *People v. Vivar* (2021) 11 Cal.5th 510, which concerned the standard of review for a trial court's ruling on a motion to vacate a conviction under section 1473.7. Under that statute, a person is entitled to relief if the trial court finds there was prejudicial error affecting the person's ability to meaningfully understand the actual or potential immigration consequences of a criminal plea. (*Vivar*, at pp. 527-528.) *Vivar* described the question presented as whether "appellate courts must review deferentially factual findings made by the trial court concerning prejudice under section 1473.7, even if those findings are based on a cold record consisting solely of documentary evidence." (*Vivar*, at p. 521.) *Vivar* concluded that independent review was appropriate, and identified "multiple factors" for its conclusion. (*Id.* at p. 527.) As Gomez points out, one of those factors was that "the judge adjudicating the resulting motion may never have participated in any of the underlying proceedings and must rely entirely on a cold record." (*Id.* at pp. 526-527.) However, *Vivar* is otherwise dissimilar to this case because one of the reasons for *Vivar*'s holding was the principle that "[w]hether counsel's advice regarding immigration was inadequate and whether such inadequacy prejudiced the defense, while mixed questions, *are predominantly questions of law*." (*Id.* at p. 524, italics added.) Here, the trial court made findings of fact; it did not decide "mixed questions" which were "predominantly questions of law." (*Ibid.*)

Next, Gomez relies on case law explaining the standard of review when a trial court determines whether a defendant's confession to law enforcement was voluntary. Specifically, *People v. Maury* (2003) 30 Cal.4th 342, 404 (*Maury*) stated that if a confession is contained in a recording, " 'the facts surrounding the giving of the statement are *undisputed*,' " and the appellate court therefore need not conduct a substantial evidence review of any trial

25

court findings.  (*Ibid.*, italics added.)  *Maury* is inapposite because the evidence at issue in this case is not comparable to a single undisputed tape recording of a defendant's confession.  Although the relevant evidence was set forth in trial transcripts and other written documents, the *facts* of Daniel M.'s murder and Gomez's involvement were very much disputed.  When the facts are disputed in a proceeding to determine the voluntariness of a confession, the appellate court applies the familiar substantial evidence standard of review to the trial court's findings.  (*People v. Williams* (2010) 49 Cal.4th 405, 436 [" ' " 'the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence' " ' "].)[11]  That same standard is appropriate here.

Finally, Gomez attempts to draw support from case law describing the standard of appellate review when a trial court rules on a motion to exclude prospective jurors for cause in a death penalty trial.  Although the trial court's determination in that context is entitled to deference when the trial court *personally* observes the jurors, when the trial court makes for cause determinations solely on "the 'cold record' of the prospective jurors' answers on a written questionnaire, the same information . . . is available on appeal."

---

[11]    In a footnote to his discussion of *Maury*, *supra*, 30 Cal.4th 342, Gomez cites *People v. Duff* (2014) 58 Cal.4th 527, 551, for the proposition that an independent standard of appellate review also applies in the *Miranda* context (*Miranda v. Arizona* (1966) 384 U.S. 436) when the facts are undisputed because the defendant's statement was recorded.  That case, like *Maury*, is inapposite because the facts regarding Daniel M.'s murder are disputed.  For the same reason, contrary to Gomez's contention, this case does not concern "[t]he legal sufficiency of *undisputed* evidence" (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 316, fn. 3, italics added), "[t]he application of a statute to *undisputed* facts" (*People v. Groat* (1993) 19 Cal.App.4th 1228, 1231, italics added), or "the application of an interpreted statute to *undisputed* facts" (*Dyer v. Department of Motor Vehicles* (2008) 163 Cal.App.4th 161, 168, italics added).

Accordingly, the appellate court reviews the record de novo. (*People v. Avila* (2006) 38 Cal.4th 491, 529; see also *People v. Stewart* (2004) 33 Cal.4th 425, 451 [not giving deference to the trial court's dismissal of death penalty jurors for cause when the trial court was "informed by no more information than the cold record of the five prospective jurors' check marks and brief handwritten comments"].) Gomez cites this line of cases because they attach significance to the fact that both the trial court and the appellate court are reviewing a " 'cold record.' " (*Avila,* at p. 529.) However, we see nothing in those cases that suggest their approach is applicable beyond the unique situation in which they arise: a trial court's reliance on a written questionnaire rather than on an in-person assessment of a prospective juror in deciding to dismiss that juror for cause. Nothing in either *Avila* or *Stewart* calls into question the generally applicable rule that in a review of a trial court's factual findings, we accord the same deference whether they are based on documentary evidence or live testimony. (*Shamblin, supra,* 44 Cal.3d at p. 479; *Haraguchi, supra,* 43 Cal.4th at p. 711, fn. 3.)

In sum, after our review of the relevant case law, we conclude that our Supreme Court's decision in *Perez* is closely on point and controls here. (*Perez, supra,* 4 Cal.5th at p. 1066.) As here, *Perez* dealt with a resentencing procedure created by our Legislature and considered the same question presented in this appeal, namely, whether a de novo standard of review applies when the trial court does not consider any live testimony in deciding whether the petitioner is eligible for resentencing. (*Ibid.*) Relying on *Perez,* we conclude it is appropriate for us to apply a substantial evidence standard in reviewing the trial court's finding that Gomez is guilty of murder under the law as amended by Senate Bill 1437.

E.    *The Trial Court's Finding Was Supported by Substantial Evidence*

Finally, we examine Gomez's contention that insufficient evidence supports the trial court's finding that Gomez is guilty of murder under a currently valid theory because he was a coconspirator in the murder of Daniel M.

As we have established above, in an appeal from an order denying a petition for resentencing after the trial court holds a hearing under section 1172.6, subdivision (d), "[w]e review the trial judge's fact finding for substantial evidence. [Citation.] We ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' [Citation.] Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*Clements, supra*, 75 Cal.App.5th at p. 298.)

"[A] conviction of conspiracy to commit murder requires a finding of intent to kill, and cannot be based on a theory of implied malice." (*Swain, supra*, 12 Cal.4th at p. 607; see also *People v. Cortez* (1998) 18 Cal. 4th 1223 [all conspiracy to commit murder convictions are necessarily conspiracy to commit premeditated and deliberated first degree murder].) The jury instruction for conspiracy to commit murder sets forth the following elements: "1. The defendant intended to agree and did agree with [one or more of] (the other defendant[s]/ [or] <*insert name[s] or description[s] of*

28

*coparticipant[s]>*) to intentionally and unlawfully kill; [¶] 2. At the time of the agreement, the defendant and [one or more of] the other alleged member[s] of the conspiracy intended that one or more of them would intentionally and unlawfully kill; [¶] 3. (The/One of the) defendant[s][,] [or *<insert name[s] or description[s] of coparticipant[s]>*][,] [or (both/all) of them] committed [at least one of] the following overt act[s] alleged to accomplish the killing: *<insert the alleged overt acts>*; [¶] AND [¶] 4. [At least one of these/This] overt act[s] was committed in California." (CALCRIM No. 563.) The instruction also emphasizes that "[c]onspiracy to commit murder requires an intent to kill," and "[t]he People must prove that the members of the alleged conspiracy had an agreement and intent to commit murder." (*Ibid.*)

Focusing on the requirement that a defendant must possess an intent to kill to be convicted of conspiracy to commit murder, Gomez contends that insufficient evidence supports a finding he had an intent to kill Daniel M.

Gomez acknowledges that he was recorded stating: "Nah, we were lookin' to blast some Locos and Orphans so we—It was me and Rascal and it was him [i.e., Moedano] and Boxer. And this fool says, 'man, let's call it a night and let's meet up in the street . . .' [LAUGHTER] [¶] . . . And we were looking for . . . we were looking for that fool from V.U. Like man, and we're like—and the next thing you know, hey, isn't that the fool from V.U.? An' he walking by us . . ." Indeed, in finding that Gomez was guilty of being a coconspirator to murder, the trial court relied on Gomez's statement that he and his companions were "lookin' to blast" certain rival gang members, including Daniel M. (i.e., "that fool from V.U."), which is what ended up happening.

However, according to Gomez, there is no reasonable basis for understanding the statement that they were "lookin' to blast" rival gang members as meaning that they had agreed to commit *a killing*. Instead, Gomez argues, the statement establishes nothing more than that they had agreed *to shoot at* certain rival gang members. Gomez contends the statement that he and his companions were looking to "blast" rival gang members "is, at most, consistent with conduct that might constitute implied malice—the doing of an act that endangers the life of another coupled with a conscious disregard for life," but it does not establish an intent to kill.

Gomez couples his argument about the meaning of the term "blast" with a focus on other facts that he contends make it unlikely that he acted with an intent to kill Daniel M. Specifically, as Gomez points out, the evidence at trial showed that (1) Gomez may have been stepping away from his involvement with the Dukes gang at the time of the murder, as he was enrolled in college and had a job; and (2) there is no evidence that Gomez or any of his companions were previously involved in a killing.[12]

---

[12] Gomez also argues that in assessing the sufficiency of the evidence we should place weight on the fact that, at trial, the prosecutor purportedly "did not view the evidence as supporting a conspiracy to commit murder because the prosecutor did not rely on or argue that theory to the jury and instead argued murder was a natural and probable consequence of a conspiracy to commit a felonious assault." We reject the argument. The fact that, prior to Senate Bill 1437, the prosecutor in a murder case elected to rely on the natural and probable consequences doctrine rather than attempting to prove a conspiracy to commit murder does not indicate that the prosecutor believed the People would be unable to prove a conspiracy to commit murder. Instead, that choice shows nothing more than that, as a matter of trial tactics, it is reasonable to pursue the theory of murder that is easier to establish. There was no reason for the prosecutor to confuse the jury with a range of alternative theories for murder when a natural and probable consequences theory, which was valid at the time, would suffice.

We understand Gomez's argument, but we reject it because it is more appropriately made to a finder of fact than to an appellate court conducting a review for substantial evidence. It is undisputed that, at a minimum, the word "blast" means to shoot. In certain contexts it might be unreasonable to understand the word "blast" to mean to shoot at someone with the intent to kill that person. However, in the context of this case, a reasonable finder of fact could conclude that when Gomez stated that he and his companions were "lookin' to blast" rival gang members, he meant that they were looking to shoot and kill them.

The strongest evidence supporting that interpretation is what actually ended up happening. When Gomez's group located Daniel M., one of them (Moedano) ran out and shot Daniel M. multiple times at close range in the back until the gun was empty, with the clear intent to kill him, not just to shoot at him. Further, when Gomez was recorded months later talking about the killing to his fellow gang members, he did not say anything about being surprised that Moedano shot Daniel M. in a manner that was plainly intended to kill him.

Gomez points out that both he and Moedano stated in the recording that some aspect of the incident was "unexpected."[13] Based on that statement, Gomez contends the recording shows it was "unexpected" that Moedano would kill Daniel M. Gomez's argument is not persuasive. Based on the entire context of the recorded conversation, the most reasonable interpretation is that both men described the encounter with Daniel M. as "unexpected" because they had already given up on trying to find Daniel M.

---

[13]  Moedano stated, "it was like unexpected." Gomez stated, "That shit was unexpected," and "Yeah, we were not expecting that shit."

when he ended up crossing their path.[14]  The recording contains no indication that Gomez was in any way surprised that Moedano took action to shoot and kill Daniel M. after Daniel M. unexpectedly walked past them.

In sum, we conclude that substantial evidence supports the trial court's finding, beyond a reasonable doubt, that Gomez acted as a coconspirator in Daniel M.'s murder, including that he acted with the intent to kill Daniel M.

## DISPOSITION

The order denying the petition for resentencing is affirmed.

IRION, J.

WE CONCUR:


HUFFMAN, Acting P. J.


O'ROURKE, J.

---

14    We note that during Gomez's trial, Marquez testified as to his understanding of what Gomez and Moedano meant when they stated that some aspect of Daniel M.'s killing was unexpected.  The trial court was not required to credit that interpretation of the statements, as Marquez was testifying about the meaning of someone else's words describing an event in which he did not participate.